UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| FORSYTHE RACING, INC., an Illinois corporation, | ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | 1:04-CV-2102 SEB-VSS |
| PLAYER'S COMPANY, INC., a Canadian corporation; IMPERIAL TOBACCO CANADA LTD., a Canadian corporation; and PLAYER'S LTD., a Canadian corporation, | ) ) ) ) ) | |
| Defendants. | ) | |

## ENTRY ON CROSS MOTIONS FOR SUMMARY JUDGMENT AND MOTION TO STRIKE

This matter is before the Court on the motion for summary judgment filed by the

two remaining Defendants, Player's Company, Inc. ("Player's") and Imperial Tobacco

Canada LTD ("Imperial"), and the motion for partial summary judgment filed by the

Plaintiff, Forsythe Racing, Inc. ("Forsythe Racing") and a related motion to strike filed by

Defendants.[1]  Because the statute of frauds does not bar Plaintiff's recovery and because

questions of material fact remain with regard to all other issues, we deny the cross

motions, except that Plaintiff is entitled to summary judgment on the sole issue of the

inapplicability of the  statute of frauds.

---

[1]As a result of previous settlements and rulings in this case, the only claims that remain are Count I (breach of oral contract) and Count III (promissory estoppel) of Plaintiff's First Amended Complaint, and those claims are pursued against only Player's and Imperial.

*Summary Judgment Standard*

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Electric Industrial Co. v. Zenith Radio Corp*, 475 U.S. 574, 587 (1986).  Summary judgment should be granted only where the pleadings, depositions, answers to interrogatories, affidavits, and other materials demonstrate that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56©).  Only genuine disputes over material facts can prevent a grant of summary judgment.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  A fact is material if it might impact the outcome of the suit under the governing law.  *Id.*

When deciding a motion for summary judgment, we rely only on those facts which are undisputed and view additional evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the non-moving party.  *See* Fed. R. Civ. P. 56©); *Anderson*, 477 U.S. at 255; *Conley v. Village of Bedford Park*, 215 F.3d 703, 708 (7th Cir. 2000).  Because "summary judgment is not a paper trial, our role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe."  *Waldridge v. American Hoenchst Corp*., 24 F.3d 918, 920 (7th Cir. 1994).  Our only task is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial."  *Id.*

-2-

*Background*

Forsythe Racing, started by businessman Gerald Forsythe, has been in the business of owning and operating open-wheel motor racing teams since the 1980s. Mr. Forsythe is a successful businessman who has owned numerous companies and who, along with his daughters, owns a related group of companies which share the "Indeck" brand name. Defendants are related Canadian companies. Imperial is a tobacco company and the sole shareholder of Player's, which is also the name of one of several brands of cigarettes under the Imperial umbrella. Since 1961, Player's has sponsored motor racing events and drivers. Imperial, the parent company, created another corporate entity, Player's Ltd., because more recent Canadian tobacco laws prohibited the advertisement or promotion of specific tobacco products, but permitted sponsorship under corporate names.[2]

In 1995, Forsythe Racing and Player's formed a fifty-fifty joint venture, called Player's/Forsythe Racing Team, Ltd. (the"Team")[3], to operate a race team to compete in the Championship Auto Racing Teams, Inc. ("CART") racing series.[4] Player's Ltd. was

_____

[2]All of the claims brought against Player's Ltd. in this lawsuit have previously been dismissed.

[3]Player's/Forsythe Auto Racing Teams, Inc., was a Delaware Corporation, whose principal place of business was Indianapolis, Indiana. It recently went through dissolution proceedings in Delaware.

[4]In addition to his interest in the Team, Mr. Forsythe began acquiring an interest in the racing series itself in April of 2000. Through purchases of CART stock his interests grew through September 2002, at which time he controlled a 23% interest. He also owns interests in various race tracks.

the Team's "primary sponsor," funding approximately 95% of the Team budget or between $16 million and $20 million per year, and thereby gaining the principal branding exposure on the Team's racing vehicles.  Mr. Forsythe, through his Indeck companies, contributed approximately one million dollars each year to the Team's funding.  The day-to-day operations of the Team were managed by Neil Micklewright, the Team's vice president, and the operations were overseen in general by Mr. Forsythe, as president.  In addition, Player's appointed its own liaison to the Team who could represent its interests.  At all times relevant to this lawsuit, that liaison or point person was Michael Bonelli.  Mr. Bonelli was an employee of Player's Ltd., but enjoyed direct access to Robert Bexon, the CEO of Imperial and an active racing fan.[5]  Bonelli was responsible for monitoring the effective use of Player's financial commitment to the Team and was the point person for the Team in negotiations with drivers or their agents.

As a Canada based tobacco company and brand, Imperial and Player's had a specific interest in the Team utilizing drivers who were Canadien and popular within the country.  Accordingly, Player's required the Team to contract only with Canadian drivers. Prior to 2002, the Province of Quebec enacted legislation which capped the amount of money a tobacco company could spend on sponsorships.  The Canadian national

_____

[5]In the deposition testimony of most witnesses, and at various times within the parties' briefs, the name "Player's" is  used generically to refer to the three related companies that had some interest in the racing enterprise engaged in with Gerald Forsythe, whose last name was also often used as a generic reference to his racing corporation.  While we will try to be specific in our corporate references while setting forth the factual background, we are limited by any inaccuracies or lack of specificity in the generic references found in the deposition testimony or briefs.

government also had passed certain restrictions in 1997 and 1998, the latter of which sought to prohibit tobacco-related advertising in connection with, among other things, motor racing, effective fall of 2003. Imperial was challenging the constitutionality of the 1998 national legislation in the Canadian courts.  The parties have referred to the litigation as the "C-71" litigation, a nod to the legislative number of the challenged Act. If the legal challenges to the legislation were not upheld, 2003 would be the last CART racing season where Canadian tobacco companies could sponsor drivers or teams. Despite Bonelli's positive outlook with regard to the outcome of the legal challenge, the effective date of the legislation presented an obstacle in 2002 to his recruiting and signing drivers for the Team's 2003 season.

During the summer of 2002, Bonelli had been instructed by Bexon and Player's Director of Communications, Neil Blanche, to contact the agent of Paul Tracy, a top Canadian driver, about obtaining his services for the 2003 racing season.  Tracy, and his Canadian contemporary, Patrick Carpentier, who was on the last year of his driver's contract with the Team, were both available to drive in 2003, but both demanded two year commitments.  Reaching agreement on the financial terms required to obtain the services of these two drivers was not the biggest hurdle for Bonelli and the Team.  The biggest hurdle was how to overcome the conflict between the drivers' need for a two-year commitment and the possible loss of the legal challenge to the national legislation limiting tobacco company sponsorships, which was set to go into effect at the end of the first season.  Player's was in no position to openly promise to financially support the

second year of any Team contract with the drivers, in light of the effect that might have on its image during the challenge to the legislation.  What happened during the summer of 2002 leading up to the Team's successful signing of drivers Tracy and Carpentier is at the heart of the factual and legal dispute in this lawsuit.

On July 31, 2002, Bonelli drafted a memo to Mr. Forsythe that included the following pertinent representations (with the specific breakdown of the amounts to be paid redacted by the court in response to the parties' stipulation that it is confidential trade information):

> After a great deal of going back and forth, it is with great pleasure to (sic) inform you that we have reached an agreement with Paul Tracy for the 2003 and 2004 race seasons, pending your approval. ...
> Our tentative agreement is as follows:
>
> **2003**
> We have agreed to pay Paul substantially higher to race for us in 2003 if he would agree to a payment plan that is spread over three years in order to allow Player's to respect the spending cap.  The compensation will be ____ plus __ % of his earnings over the course of the 2003 season. ... Player's will also agree to sign Paul to a personal services contract for the 2004 and 2005 seasons at a cost of _____ per year.  Paul agrees to make __ corporate appearances for Imperial Tobacco Canada Limited including the Canadian race events and the balance to be mutually agreed upon ...
>
> 2003 - ___ + __% of his prize and CART points earnings
> 2004 - ___ Personal Services Contract (no incentives)
> 2005 - ___ Personal Services Contract (no incentives)
>
> We have also agreed to his request (deal breaker) to switch to Lola Chassis for the 2003 and 2004 seasons.
> Paul also wanted a guaranteed three year contract which we explained to him was out of the question but he was not willing to accept less than a two year deal. (deal breaker) ...

**2004**

Should Imperial Tobacco Canada win the C-71 court case and be permitted to race and sufficiently promote our involvement I the 2004 CART season, Player's would be responsible to compensate Paul Tracy in the following way, which is over and above his personal services agreement:

___ + __% of his CART Race and Points standing earnings and the following incentives during the season: ...

In the event that Imperial Tobacco Canada Limited should lose our current court challenge of Bill C-71, and not be permitted to race and sufficiently promote our involvement in the 2004 CART season, Forsythe Racing [or a corporate entity of your choice] shall be responsible to provide Paul with a Lola chassis and the above listed compensation to race in the CART series.

We have provided Paul with an out clause for 2004 that can also work for Forsythe Racing.  Should Forsythe Racing be unable to provide Paul with a confirmed ride in a Lola for the 2004 CART Series by July 31, 2003, Paul will maintain the right to withdraw his services and shall receive ___ in lieu of the 2004 consideration outlined above.

Jerry, it should be noted that Paul is comfortable racing for you in 2004 but wanted to ensure that if you decided not to field a car, that he would have a suitable amount of time to find a competitive ride. ...

We eagerly await your reply to this note and would like to announce Paul's signing the week of August 12th ...

I look forward to speaking with you as soon as possible so we can have an agreement drafted and ready to sign in Mid-Ohio [a CART race scheduled for August 11, 2002].

Gerald Forsythe sent a fax to Michael Bonelli on August 5, 2002 congratulating Bonelli on his negotiations with Tracy and stating:  "One down, one to go."  In his deposition, Mr. Forsythe testified that, during the weekend of the Elkhart Lake CART race in mid-August, Bonelli came up to him and said:  "We have a problem.  The drivers have requested a two-year contract.  We cannot legally enter into that contract.  We need

you to sign the contracts, and we will find a way to pay you for the drivers' salaries."
Bonelli and the Defendants deny that such a representation was made, but Micklewright,
who was also in attendance when Bonelli spoke to Forsythe, confirms Forsythe's version
of the conversation.  Under further deposition questioning, Mr. Forsythe testified that he
had received copies of the proposed contracts, which were drafted by Imperial's legal
counsel, on the last day of July 2002 and within a few days had called Neil Micklewright
and said: "Neil I don't know if you've discussed this with Michael, but he has this
proposal of Forsythe Racing paying for the 2004 salaries for Player's.  That's not
happening."  However, Mr. Forsythe testified that he had never directly related his
position to Bonelli.

On September 1, 2002, Mr. Forsythe received a hand-delivered letter from two of
Imperial's in-house attorneys who had drafted the contracts to retain Paul Tracy as a
driver for the Team in 2003 and 2004.  The contracts were prepared based on information
given the attorneys by Bonelli and the agents for Tracy and Carpentier.  The letter to
Gerald Forsythe read as follows:

Object:     Driver Services Agreement between Forsythe Racing Team
            Inc., PTR, Inc. and Paul Tracy (the "Agreement")

Dear Mr. Forsythe,

Please find attached the most recent draft of the above-captioned
Agreement. We drafted this Agreement according to the instructions we
received from Player's/Forsythe Racing Team Ltd. and its personnel.  This
Agreement is governed by the laws of Illinois.  As we are not licensed to
practice law in the United States or to give legal advice in relation to the
laws of Illinois, it is impossible for us to give any representation, warranty,

opinion or advice in respect of the legality, validity, enforceability or
binding character of the provisions of the Agreement.

We recommend that you review carefully the Agreement to ensure that it
reflects your understanding and expectations of the transaction described
therein.  We also recommend that you seek an opinion from an attorney
who is competent to practice law in the State of Illinois in order to ensure
that the provisions of the Agreement are legal, valid, binding and
enforceable.

The letter was on stationery with a "Team Players" logo affixed and signed by attorneys
Caroline Ferrand and Paola Tawile.  Forsythe knew the two attorneys were both
employed by Imperial but assumed they were also representing the best interests of the
Team in drafting the drivers' agreements.

Mr. Forsythe did not enlist any other attorneys in this project.  Nor did he at any
time communicate in writing that he would not agree to a deal requiring Forsythe Racing
or the Team to pay the salaries of a driver in 2004 if the C-71 litigation were to prove
unsuccessful.  Instead, presumably based on the disputed mid-August comment of Bonelli
at the Elkhart Lake race, he signed the two Driver Services Agreements prepared by
Ferland and Tawile.  The first, or initial Driver Services Agreement between Tracy  and
the Team, set forth a two-year arrangement that would continue in effect if the C-71
litigation were to prove successful for the tobacco companies, but provided that the
contract would be substituted with the back-up contract should Imperial and Players
determine by the end of June 2003 that their sponsorship rights under the existing law
would be materially less advantageous for the second year or 2004 season.  If such a
determination were made, the initial contract provided that the payment obligations set

forth for year two would be assumed by Forsythe Racing under the back-up agreement that had been executed contemporaneously.  The back-up agreement included identical payment terms, except for the fact that it was between Tracy and Forsythe Racing. Tracy's base salary for 2003 was $1,400,000 which covered the 2003 season, and $3,000,000 covering the 2004 season; various additional financial incentives were provided for as well, based on performance.

Bonelli sent a fax to Gerald Forsythe on September 3, 2002, containing details of his negotiations with the agent for Patrick Carpentier.  The first page of the fax included the following statement:  "Thank you on behalf of everyone at Player's for your willingness to go to the extent that you have in order to ensure that Paul and Pat would drive for the Team.  I truly believe that neither deal would have been possible without your support of the second years' (sic) in these agreements."  Forsythe did have a further conversation with Bonelli at the Miami CART race later during the 2002 season following his having signed the Tracy Driver Services Agreements.  According to Forsythe, Bonelli indicated that he was in negotiations with Patrick Carpentier's agent, had agreed on a salary, and, similar to the Paul Tracy situation, Forsythe would have to sign a back-up contract.  Mr. Forsythe claimed that Bonelli again assured him that Player's would somehow find a way to pay the 2004 drivers' salaries.  In sworn testimony, Carpentier's agent, Alan Labosse, stated that Bonelli had confirmed during that same time period that Player's was going to be responsible for paying the 2004 driver salaries through Forsythe Racing regardless of the outcome of the C-71 litigation.

However, Bonelli and the Defendants deny that he made that representation.

As he did with the Tracy Driver Services Agreements, on October 10, 2002, Gerald Forsythe signed off on the two Driver Services Agreements intended to retain the services of Patrick Carpentier. As with Tracy, the back-up agreement with Carpentier required Forsythe Racing to make salary payments if Imperial and Player's were to decide following the first season under existing law they could not derive the same promotional benefit as what they had derived during the 2003 season. Carpentier's base salary for the 2003 season was $1,500,000 and for the 2004 season, $1,650,000. According to Forsythe, he signed the agreements based on Bonelli's promise that Player's would find a way to pay the 2004 salaries, regardless of the outcome of the litigation.

Imperial's C-71 litigation ultimately proved unsuccessful when, in December of 2002, the Canadian tobacco legislation was ruled constitutionally permissible. As a result, Player's Ltd. did not renew its sponsorship of the Team for the 2004 season and, pursuant to the Canadian law effective October 2003 (which was one month prior to the end of the 2003 CART season), displays of the Player's brand name were removed from the Team equipment so that the race cars lacked any Player's brand logos on them thereafter. The back-up agreements between Forsythe Racing and the drivers went into effect July 1, 2003. After Player's logos were removed from the cars and the 2003 season ended, Mickelwright sent Mr. Forsythe a memo, stating:

> In accordance with the new driver contracts, wherein their salaries are now the responsibility of Forsythe Racing, I need to pay them next Monday,

-11-

> December 1st. ... Obviously, we have zero money here to cover this or any expenses after November 30th.  Please advise me on how you would like me to proceed.

Forsythe directed Katie Hein, the Team bookkeeper, to send an invoice to Player's Ltd. for the months of December 2003 and January 2004 to cover the driver salary payments. Player's Ltd. did not pay the invoices.

In June of 2004, Forsythe Racing's general counsel wrote a letter to Imperial inquiring as to its reasons for not living up to its promises.  The letter asserted that Forsythe Racing would never have taken on responsibility of payment of the 2004 salaries of the drivers were it not for Bonelli's representation to Gerald Forsythe "that your organization would 'find a way' to reimburse Forsythe Racing for the 2004 drivers' contracts."

When Forsythe Racing's demand for payment of the drivers' salaries was denied by Imperial and Player's, this lawsuit ensued.  Forsythe Racing utilized Tracy and Carpentier as drivers during the 2004 season and paid their salaries.  Forsythe utilized cash it received from dividends from one of his Indeck companies to pay these salaries but claims the funds were provided as a loan.  The Indeck companies were also included as sponsors in branding displayed on the two cars.

### *Discussion*

On numerous grounds, Imperial and Player's seek summary judgment in their

favor.  They argue that, even if Bonelli were found to have made the statements that Forsythe says he made concerning underwriting Forsythe Racing for any 2004 drivers' salary obligations it might incur, such a promise is unenforceable because it was no more than an agreement to agree.  Defendants argue that, in any event, the terms of any alleged agreement are so vague that they can not be either understood or enforced.  Which entity was Bonelli binding?, query the Defendants.  How much was to be paid?  Who was to be paid, and when?  These are required contractual terms that remain unanswered, according to Defendants.  Further, they argue that assuming an agreement or promise is deemed to have been made by Forsythe Racing, it is unenforceable because it is a contract for an illegal purpose, to wit, a skirting by Imperial or Player's of Canadian law.  Defendants also contend that the Statute of Frauds negates any oral agreement and that, even if it did not, Forsythe Racing suffered no damages because the salary costs were assumed by the Indeck companies who received sponsorship benefits.  Finally, though not asserted as a basis for summary judgment, Defendants maintain by way of an affirmative defense that Bonelli was not authorized to make the promise he is alleged to have made.

Forsythe Racing has filed its own motion for summary judgment as to two of the affirmative defenses raised by the Defendants.  It first contends that the Statute of Frauds does not apply to the undisputed facts at play here.  Second, Plaintiff contends that Bonelli clearly acted within the scope of his apparent authority and thereby bound Defendants by his actions and representations.  We address these two issues first.

We agree that there is ample evidence in the record to support the conclusion that Bonelli acted with authority making the promise Forsythe claims that he made.  Player's fifty/fifty partnership with Forsythe Racing led to the formation of the Player's/Forsythe Racing Team, Ltd., referred to here as the "Team."  In compliance with Canadian law, Player's Ltd., through its payment of sponsorship dollars, underwrote the budget to fund the Team.  It is undisputed that Bonelli was paid by Player's Ltd. and was given the responsibility of monitoring the Teams' operations and serving as the liaison for Player's in obtaining the services of the drivers that Player's or its parent, Imperial, preferred and in negotiating the drivers' contracts.  Bonelli made numerous financial representations to the Team which were thereafter honored by both Player's and Imperial.  Indeed, the drivers' agents, Team officials and various others all testified that, broadly speaking, Bonelli acted as the spokesman for Player's with regard to the CART race team.

However, it is also clear that at least some evidence suggests that Bonelli was not the sole spokesman for the related tobacco entities in terms of race team issues. Mickelwright, whose duties required him to run the team on a day-to-day basis, would often communicate with persons at Imperial, including Bonelli's boss, Mark Thorne; Imperial's Controller, Christian Trepanier; and Imperial's Director of Communications, Neil Blanche, regarding plans and financial allocations.  Defendants concede that these communications provide evidence of various important decisions having been vetted through Imperial's officials, despite the role of Player's Ltd. as "sponsor" of the Team, and evidence as well that Bonelli may not have always been perceived as the voice of

-14-

authority on these matters.   Accordingly, a resolution of the issue of Bonelli's apparent or inherent authority will turn on fact issues and credibility determinations which cannot be decided on summary judgment.  Consequently, we withhold summary judgment as to the affirmative defense alleging that Bonelli was acting outside his scope of authority.

However, summary judgment is appropriate regarding the Statute of Frauds issue. Both parties apparently agree that Indiana law applies here; accordingly, we must determine whether Indiana's Statute of Frauds, Ind. Code § 32-21-1-1, is applicable.  That statute provides:

> (b) A person may not bring any of the following actions unless the promise, contract, or agreement on which the action is based, or a memorandum or note describing the promise, contract, or agreement on which the action is based, is in writing and signed by the party against whom the action is brought or by the party's authorized agent:
> ...
>> (5) An action involving any agreement that is not to be performed within (1) year from the making of the agreement.

Ind. Code § 32-21-1-1(b)(5).  Indiana courts, and federal courts interpreting Indiana law, have construed this section to provide that it is not applicable to agreements that can be performed within a year, but only to those agreements in which it is expressly stipulated that they would not be performed within a year.  *Skywalker Communications of Indiana, Inc. v. Skywalker Communications, Inc.*, 333 F.3d 829, 831 (7th Cir. 2003); *Wallem v. CLS Industries, Inc.*, 725 N.E.2d 880, 887 (Ind. App. 2000).  More succinctly, Indiana case law holds that "only if it is *impossible* for an oral contract to be completed within one year does it fall within the Statute of Frauds." *Tobin v. Ruman*, 819 N.E.2d 78, 85

-15-

(Ind. App. 2004)(emphasis in original).

In the case at bar, Bonelli is alleged to have orally represented in August of 2002 that payment would be made of Tracy's 2004 salary and then later confirmed, during the 2002 Miami Cart race during the first weekend of October 2002,  that the salaries of both drivers would be paid by Player's, regardless of the outcome of the C-71 litigation.  The parties did not prevail in December of 2002 in the C-71 litigation, following which, prior to the June 30, 2003 deadline, Player's appropriately noticed its intention not to sponsor the Team in 2004.  At that time, if Bonelli's word were controlling, payment of the salaries for the 2004 season could have been made.  In fact, nothing prevented Player's or Imperial from making such a payment as soon as they had been informed of the outcome of the litigation.  Given that the challenged statute did not go into effect until October 2003, payments could have been made before that effective date rather than waiting more than a year following the alleged promise.

Defendants argue that, because the 2004 earnings of Tracy and Carpentier included certain incentives and results-based payments, the amount they were entitled to receive could not be determined within a year of the alleged promise to pay.  However, Plaintiff does not contend that Bonelli promised to pay anything other than the base salaries. Incentive payments and other such obligations under the contract were not to be assumed by Player's or Imperial.  The amounts of the drivers' base salaries for the 2004 race season were specifically set forth in their agreements and, had they chosen to do so,

-16-

Defendants could have paid those sums to Forsythe Racing at the time their commitment ended.  Accordingly, Indiana's Statute of Frauds does not apply here.

We next address Defendants' arguments in favor of summary judgment.  Having determined that the Statute of Frauds does not apply, we examine Defendants' contention that no enforceable agreement was ever reached between the parties, but if it was, it was void *ab initio* because it was an agreement for an illegal purpose.  Further, Defendants allege that  neither equitable nor legal relief is available to Plaintiff because  the Team received funding for the drivers' 2004 salaries from another entity, which had the effect of completely mitigating any damages for which Defendants might otherwise have been liable.

In support of the contention regarding mitigation of damages,  Plaintiff has submitted affidavits from Gerald Forsythe and Sandy Holm, Forsythe's assistant, which aver that most of the funding the Team received for its operations in 2004, including drivers' salaries, came from cash dividends which Gerald Forsythe had received from Indeck Energy Services and which he, in turn, loaned to the Team.  Plaintiff also submits certain accounting documentation as further support for this contention.  In response, Defendants seek to have this documentation as well as the affidavit of Sandy Holm stricken based on its not having been produced during discovery and because Holm has never been disclosed as a witness.  Defendants seek to have Forsythe's affidavit stricken on the grounds that it contradicts his deposition testimony.  In reply, Plaintiff accuses

Player's and Imperial with having contradicted themselves by raising for the first time a mitigation defense at the summary judgment stage, noting that previously Defendants had asserted an affirmative defense only of <u>failure</u> to mitigate.  Regarding Forsythe's affidavit, Plaintiff argues that it merely clarifies, rather than contradicts, Forsythe's prior testimony, though Defendants dispute this characterization of the affidavit as mere clarification as disingenuous.

We decline to engage in a "fine tooth comb" analysis of the deposition testimony provided by Gerald Forsythe and various other witnesses, comparing their sworn testimony with subsequent affidavits.  Instead, we rely on Defendants' own description of Plaintiff's contention as "disingenuous" in denying the motion to strike and shall consider the challenged evidence and affidavits.

Disingenuousness necessarily includes some assessment of credibility, which is beyond the purview of the Court in ruling on summary judgment motions.  To determine whether Gerald Forsythe and his racing entity are creating facts as they go, attempting to provide post hoc explanations for prior testimony is an issue that must be resolved by the factfinder at trial.  If it develops that Gerald Forsythe and/or any other deponent has provided factually conflicting versions of the events at issue here, he/they may well be inviting serious sanctions for perjury.  Though Plaintiff's explanation of the circumstances is in major respects at best convoluted, without the benefit of a review of all the evidence together with the opportunity to make appropriate credibility

-18-

assessments, it remains unsettled whether Plaintiff owes Mr. Forsythe the amount he paid to advance funds to underwrite the drivers' 2004 salaries.  Regarding Holm's affidavit and accounting documentation, Holm's testimony essentially serves only to authenticate the documentation, which, based on our review, was not responsive to the discovery questions or requests posed by Defendants.  Therefore, neither Holm's affidavit nor the accounting records must be stricken.

The issue of whether Plaintiff suffered recoverable damages also remains in conflict, as does the issue of  whether an enforceable agreement was ever reached.  If the jury chooses to believe the testimony of Bonelli, as agent for Imperial or Player's, that the 2004 drivers' salaries were to be paid by Defendants so long as Plaintiff agreed to a back-up arrangement with the drivers in order to get "the deal" done, those terms of their agreement are sufficiently definite to be enforceable.  If, on the other hand, as Defendants assert, such a statement was never made or, if made, Plaintiff should not have relied on it because there was no basis for relying on the specific amount of the financial commitment, a jury could conclude no complete meeting of the minds was ever established.  That said, the lack of agreement as to the specific date for payment or the exact amount of the required payment would not necessarily erode the bargain or promise made as unenforceable.  *Johnson v. Sprague*, 614 N.E.2d 585, 588-89 (Ind. App. 1993); *Brown County Art Guild, Inc. v. Mann*, 430 N.E.2d 1181, 1183 (Ind. App. 1982).

Indiana law requires that the terms of a contract be reasonably fixed so that the

-19-

intent of the parties can be determined.  *Haville v. Haville*, 787 N.E.2d 410, 416 (Ind.

App. 2003).  Absolute certainty is not required; all that is required to render a contract

enforceable is reasonable certainty as to the terms and conditions of the promises made.

*Illiana Surgery & Medicsal Center, LLC. v. STG Funding, Inc.,* 824 N.E.2d 388 (Ind.

App. 2005).  Generally, the identity of the party assuming a particular obligation requires

certainty.  *Id.*  However, if evidence indicates that such uncertainty as to the corporate

identity of an obligor has resulted from the manipulation of related business entities,

and/or that the person allegedly obligating one or more of those entities had authority to

speak for each, the corporations can nonetheless be held responsible.   However, that

determination can not be made on summary judgment because factual issues must be

resolved as to which, if any, of the entities should be bound.  Joint liability, particularly

between or among related parties, is a well-established principle of Indiana law.  *See*

I.L.E., *Contracts* § 81 (2000) and cases cited therein.

     Finally, we address whether the alleged oral agreement is void and thus

unenforceable because it was for an illegal purpose.  We begin by noting that no

explanation has been offered for how the oral agreement actually furthered an illegal

purpose.  Presumably, under Canadien law, so long as the Player's name or logo did not

appear on the cars and all the tobacco-related promotional activities ceased, Defendants

would not have been prohibited from paying the  salaries of the drivers for whatever

reason(s) they may chosen to do so.  In their supporting brief, Defendants never contend

that the contract itself was in fact illegal or that it would have furthered an illegal purpose.

Rather, they argue that the deposition testimony of both Mickelwright and Forsythe suggests that they believed that to be the case. No legal authority has been proffered in support of that proposition: that an otherwise enforceable agreement is made unenforceable if the representative of one of the parties to the agreement erroneously concludes that one of the obligations covered in the agreement is illegal. The paucity of authority on this point in Defendants' reply brief suggests that Defendants have abandoned the theory, but if they have not, we think they should on the merits. In any event, it certainly provides no basis for awarding summary judgment to Defendants.

## Conclusion

For the reasons expressed in this entry, Defendants' Motion to Strike (**Doc. #146**) is DENIED and Defendants' Motion for Summary Judgment (**Doc.. #111**)is also DENIED. Further, Plaintiff's Motion for Partial Summary Judgment is GRANTED IN PART, insofar as the Court concludes that the Indiana Statute of Frauds does bar Plaintiff's remaining claims; however, Plaintiff's motion is DENIED in all other respects.

IT IS SO ORDERED.

Date: 01/07/2008

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

-21-

Copies to:

Jill Christine Anderson
FREEBORN & PETERS LLP
janderson@freebornpeters.com

Monica Renee Brownewell Smith
BARNES & THORNBURG LLP
monica.brownewell@btlaw.com

Robert R. Clark
SOMMER BARNARD ATTORNEYS,
PC
rclark@sommerbarnard.com

Joseph L. Fogel
FREEBORN & PETERS LLP
311 S. Wacker Drive, Suite 300
Chicago, IL 60606-6677

Michael Joseph Kelly
FREEBORN & PETERS LLP
mkelly@freebornpeters.com

Robert D. MacGill
BARNES & THORNBURG LLP
rmacgill@btlaw.com

Mark M. Maloney
KING & SPALDING LLP
1180 Peachtree Street
Atlanta, GA 30309

Paul J. Murphy
KING & SPALDING LLP
pmurphy@kslaw.com

Ranse Murphy Partin
KING & SPALDING LLP
rpartin@kslaw.com